# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division



FILED
AUG 2 7 2019
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

UNITED STATES OF AMERICA    )
    )
v.    )    Criminal No. 3:14CR176–HEH
    )
ANDRELL HILL,    )
    )
    Petitioner.    )

## MEMORANDUM OPINION
### (Denying 28 U.S.C. § 2255 Motion)

Andrell Hill, a federal inmate proceeding *pro se*, submitted this motion under

28 U.S.C. § 2255 to vacate, set aside, or correct his sentence ("§ 2255 Motion," ECF

No. 47).[1] Hill contends that he experienced ineffective assistance of counsel[2] and

demands relief on the following grounds:

| | |
|---|---|
| Claim One: | "First trial counsel" rendered ineffective assistance because counsel failed to file a suppression motion and failed to advise Hill "of the option to seek suppression," rendering Hill's guilty plea "unknowing and involuntary." (§ 2255 Mot. 4.) |
| Claim Two: | (a) "First trial counsel failed to appropriately explain conspiracy liability which led to [Hill's] erroneous 'admission' of conduct that was the basis" for the "recommendation against the reduction for acceptance of responsibility under [United States Sentencing Guidelines |

---

[1] The Court employs the pagination assigned to the parties' submissions by the CM/ECF docketing system. The Court corrects the capitalization and punctuation in the quotations from Hill's submissions.

[2] "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

("USSG") section] 4E1.1" in the Amended Pre-Sentence Investigation Report ("PSR").[3] (*Id.* at 5.)

(b) Sentencing counsel rendered ineffective assistance because counsel failed to object to "the recommendation against the reduction for acceptance of responsibility" in the PSR. (*Id.*)

The Government responded, asserting that Hill's claims lack merit. (ECF No. 54.) Hill has filed a Reply. (ECF No. 58.) For the reasons set forth below, Hill's § 2255 Motion (ECF No. 47) will be denied.

# I. PROCEDURAL HISTORY

## A. Criminal Complaint, Criminal Information, and Guilty Plea

On July 24, 2014, a Criminal Complaint was filed in this Court, charging Hill with one count of conspiracy to distribute and possess with intent to distribute Oxycodone, a Schedule II controlled substance. (Crim. Compl. 1, ECF No. 1.) Hill was arrested on July 28, 2014. (ECF No. 3.) Later that same day, at Hill's initial appearance, the Government moved to detain Hill pending trial. (ECF No. 4.) Subsequently, a detention hearing was held, and Hill was released on pretrial supervision, subject to conditions imposed by the Court, pending trial. (ECF Nos. 7, 8.)

On December 15, 2014, Hill was charged in a one-count Criminal Information with conspiracy to distribute and possess with intent to distribute Oxycodone, a Schedule II controlled substance. (Crim. Information 1, ECF No. 12.) On January 5, 2015, Hill

---

[3] Prior to Hill's admission regarding his continued criminal activity while on pretrial release and the subsequent revocation of his bond, an initial PSR was prepared. (ECF No. 21.) The initial PSR recommended a one-level reduction for acceptance of responsibility. (*Id.* at 8.)

waived his right to prosecution by indictment and pled guilty to the one-count Criminal Information. (Waiver Indictment 1, ECF No. 17; Plea Agreement ¶ 1, ECF No. 18.)

In the Plea Agreement, Hill agreed that he was pleading guilty because he was in fact guilty of the charged offense, "admit[ted] the facts set forth in the statement of facts filed with this plea agreement[,] and agree[d] that those facts establish guilt of the offense charged beyond a reasonable doubt." (Plea Agreement ¶ 2.) Hill agreed that "[t]he penalties for this offense are a maximum term of imprisonment for twenty years" (*id.* ¶ 1), and "that the Court has jurisdiction and authority to impose any sentence within the statutory maximum . . . ." (*Id.* ¶ 4.) The Plea Agreement provided that "[t]he United States makes no promise or representation concerning what sentence the defendant will receive." (*Id.*) Hill also agreed that he understood that he was waiving his right to appeal his conviction and "any sentence within the statutory maximum described above (or the manner in which that sentence was determined) . . . ." (*Id.* ¶ 5.)

In the accompanying Statement of Facts, Hill agreed that the following facts were true and correct:

> 1.    Beginning in or before June 2012, and continuing up through and including June 27, 2014, in the Eastern District of Virginia and elsewhere within the jurisdiction of this Court, the defendant, ANDRELL HILL, did knowingly, intentionally, and unlawfully, combine, conspire, confederate, and agree with others, known and unknown, to distribute and possess with the intent to distribute Oxycodone, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846.
>
> 2.    In approximately January[] 2014, law enforcement officers became aware of the drug trafficking activities involving ANDRELL HILL and others. According to information received, HILL was obtaining and illegally distributing Oxycodone, a Schedule II controlled substance.

3.     Law enforcement's investigation revealed that HILL was purchasing Oxycodone from known and unknown co-conspirators, and then distributing Oxycodone pills and prescriptions to his sub-dealers in the Eastern District of Virginia.

4.     Beginning in January[] 2014 and continuing into May[] 2014, a series of controlled purchases of Oxycodone were made from a co-conspirator of HILL's utilizing a confidential informant who was acting under the direction of law enforcement. Each of the controlled purchases was for Oxycodone.

5.     In June[] 2014, another of HILL's co-conspirators was approached by law enforcement. This individual agreed to cooperate with law enforcement, and made controlled purchases of Oxycodone, Methadone, and an Oxycodone prescription from HILL.

6.     Under the direction of law enforcement, the second co-conspirator who is referenced in paragraph five above met with HILL at an undisclosed location. The cooperator handed HILL United States currency and in exchange, HILL handed the cooperator a prescription for 180 Oxycodone pills valued at $3,060.00. HILL also "fronted" the cooperator 60 Methadone pills and an additional 180 Oxycodone pills, having a total value of $3,180.00.

7.     A few days later, while acting under the direction of law enforcement, the cooperator met with HILL and paid HILL $3,180.00 for the pills HILL had sold to the cooperator.

8.     Law enforcement approached HILL immediately after the meeting. He was not under arrest, and was advised that he was free to leave at any time. During a pat-down of HILL, law enforcement recovered the $3,180.00 in United States currency that HILL had been paid for the drug transaction described in paragraphs 5 and 6 above.

9.     HILL advised that he had been buying and redistributing Oxycodone pills and Oxycodone prescriptions during the two-year time period preceding June 2014.

10.     HILL further advised that during that same time period, he had obtained multiple prescriptions each week for 180 Oxycodone pills per prescription. HILL then had the prescriptions filled and sold the pills to his customers, or, in the alternative, sold the prescriptions themselves.

11.     HILL advised that he kept the proceeds from his Oxycodone sales in a safe.

12.     On June 27, 2014, law enforcement officers applied for, and received authorization to execute a search warrant for a residence that was owned by HILL and his wife.

13.     During the execution of the search warrant, law enforcement officers recovered three firearms, including: a Taurus .357 Magnum revolver; a Strum Ruger semi-automatic SR 9; and a .22 Magnum pistol.

Each of these firearms was recovered from HILL's master bedroom closet, which was in close proximity to approximately $20,000.00 in United States currency (which was found hidden under the mattress in the master bedroom).

14.    Also located in HILL's bedroom in close proximity to the firearms and currency was a prescription bottle containing approximately 180 Oxycodone pills. Additional prescriptions for Contin and another medication, as well as empty Oxycodone pill bottles were found inside the residence.

15.    Each of the firearms described in paragraph 13 above is a firearm within the meaning of the law in that each is designed to expel a projectile by means of an explosive. The parties stipulate that the three firearms were manufactured outside of the Commonwealth of Virginia, and as such, traveled in interstate or foreign commerce.

16.    For purposes of relevant conduct, the parties agree that HILL distributed approximately 3,000 pills each month during the one year time period preceding his arrest for a total of 36,000 pills distributed. The parties further agree that at 30 mg per pill, this quantity converts to 7,236 kilograms of marijuana. Pursuant to the November[] 2014 United States Sentencing Guidelines, this results in an Offense Level of 32.

17.    The parties further stipulate and agree that there are no aggravating or mitigating facts that would call for a sentence outside of the advisory guideline range.

18.    The parties stipulate and agree that a two-level increase for possession of a dangerous weapon with drugs . . . is appropriate in this case.

19.    This Statement of Facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

20.    The actions of the defendant as recounted herein were in all respects knowing and deliberate, and were not committed by accident, mistake, or other innocent reason.

(Statement of Facts ¶¶ 1–20, ECF No. 19.)[4]

---

[4] By signing the Statement of Facts, Hill agreed:

> After consulting with my attorney, and pursuant to the plea agreement entered into this day between the defendant, ANDRELL HILL, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved each fact beyond a reasonable doubt.

(Statement of Facts 5.)

During the Rule 11 proceedings on January 5, 2015, Hill confirmed his understanding of the charge and the penalties for the charge. (*See, e.g.*, Jan. 5, 2015 Tr. 6–8, 16–19, ECF No. 52.) When asked if "[p]rior to coming to court [for his guilty plea], . . . [he] had an ample opportunity to discuss [his] case in detail with [his] attorney," Hill responded in the affirmative. (Jan. 5, 2015 Tr. 5.) Hill agreed that he was "entirely satisfied with [counsel's] services" and that counsel had "done everything reasonable [Hill had] asked [counsel] to do in connection with [Hill's] case." (Jan. 5, 2015 Tr. 5.)

Further, Hill agreed that he was "pleading guilty because [he was] in fact guilty" of the charged offense. (Jan. 5, 2015 Tr. 9.) Hill also agreed that he had discussed whether he had "any legal defenses or any legitimate way [he] [could] avoid conviction on this charge" with his counsel. (Jan. 5, 2015 Tr. 8–9.) When asked if anyone had "threatened [him] or forced [him] in any way to enter into [the] plea agreement," Hill responded: "No, sir." (Jan. 5, 2015 Tr. 11–12.) Hill agreed that he was pleading guilty "freely and voluntarily" (Jan. 5, 2015 Tr. 12), and that no one had "instructed [him] how to answer any of [the Court's] questions." (Jan. 5, 2015 Tr. 23.) Further, Hill agreed that his answers to the Court's questions were his own. (Jan. 5, 2015 Tr. 23.)

The Court explained that Hill's maximum sentence was twenty years of incarceration and that the exact sentence would depend upon the sentencing guidelines and Hill's criminal history. (Jan. 5, 2015 Tr. 16–18.) Hill agreed that counsel had discussed potential sentences with him and that he understood that these potential sentences were predictions not promises. (Jan. 5, 2015 Tr. 18.) Hill also agreed that he

could not withdraw his guilty plea if he received a harsher sentence than expected. (Jan. 5, 2015 Tr. 18.) The Court accepted Hill's guilty plea, finding that it was knowing and voluntary and supported by an independent basis of fact. (Jan. 5, 2015 Tr. 22–23.)

**B.     Modification of Conditions of Pretrial Release and Revocation of Bond**

On April 1, 2015, Hill and his counsel met with "the United States Attorney's office and agents with the Federal Bureau of Investigation" for a scheduled meeting. (ECF No. 27, at 1.) During the meeting, Hill "was provided with evidence, including documents and other investigatory materials showing his continued involvement in the distribution of Oxycodone" between July 2014 and March 2015, which was while Hill was on pretrial release. (ECF No. 64–1, at 20; *see* Wyant Aff. ¶ 29, ECF No. 64–2.)[5]

Specifically, during their investigation of Hill's continued involvement in the distribution of Oxycodone, law enforcement officers, *inter alia*, used the Prescription Monitoring Program ("PMP"), which "is a database for all Drug Enforcement Administration (DEA) Schedule II, III, and IV controlled substances filled at pharmacies in the Commonwealth of Virginia," (Wyant Aff. ¶ 11), and determined that "multiple individuals who had been recruited by HILL to fill Oxycodone prescriptions were still obtaining and continuing to fill Oxycodone prescriptions written by Scranage[6] even after HILL had been released on pretrial supervision on July 30, 2014." (*Id.* ¶ 12.)

---

[5] Agent Wyant is "a Special Agent of the Federal Bureau of Investigation (FBI) with more than twenty-two years of experience" who was involved in the investigation of Hill. (Wyant Aff. ¶ 2; *see* ECF No. 64–1, at 6.)

[6] During law enforcement's investigation of Hill, Dr. Clarence Scranage was identified as the physician who had written prescriptions for Oxycodone for multiple individuals who were involved in the investigation. (Wyant Aff. ¶ 3.)

Additionally, in the course of their investigation, law enforcement officers found the following evidence of Hill's continued involvement in the distribution of Oxycodone:

On December 4, 2014, December 5, 2014, and January 13, 2015, a check by law enforcement of the Virginia Employment Commission database and a check of PMP reports revealed that the following individuals had worked at Hill Phoenix Inc.,[7] Colonial Heights, Virginia, and had . . . received prescriptions for Oxycodone pills from Scranage: Andrell HILL, K.B., N.B., C.B., S.B., A.D., and M.F.

During his October 16, 2014 interview with [Agent Wyant], HILL only identified M.F. as an individual whom HILL had recruited to fill prescriptions written by Scranage.

[Agent Wyant's] review of the PMP report for Scranage from July 28, 2014 to March 2015 (after HILL's arrest) showed the following: K.B. had obtained six prescriptions, each for 180 oxycodone pills; N.B. had obtained six prescriptions, each for 180 oxycodone pills; and A.D. had obtained three prescriptions, each for 180 oxycodone pills.

The detailed report of HILL's telephone number revealed that K.B.'s telephone was HILL's tenth most frequent caller; A.D. was HILL's eleventh most frequent caller; M.F. was HILL's thirty-fifth most frequent caller; and N.B. was HILL's forty-first most frequent caller.

On February 24, 2015, Confidential Source #2 hereinafter referred to as CS#2 . . . , an individual HILL had referenced during his October 16, 2014 interview, advised that CS#2 had been receiving prescriptions for Oxycodone from Scranage for approximately 2 years. CS#2 has been filling the prescriptions at local pharmacies and then selling the Oxycodone pills to HILL.

Since approximately August 2014 and continuing through January 2015, while HILL was on pretrial release, CS#2 advised that on the majority of occasions, HILL had CS#2 travel to HILL's residence on Eagle Pass Drive in Chesterfield, VA to pick up cash to cover payments to Scranage for Oxycodone prescriptions, and to cover any prescription co-pay.

. . . .

After filling prescriptions for HILL for approximately six months, CS#2 recruited another individual (who subsequently cooperated with law enforcement, and hereinafter shall be referred to as Cooperator 1) to fill prescriptions for CS#2.

On February 12, 2015, [Agent Wyant] interviewed Cooperator 1 who advised that Cooperator 1 and CS#2 had made office visits to Scranage

---

[7] Hill "had worked at Hill Phoenix for three years." (Wyant Aff. ¶ 6.)

for alleged back pain. Cooperator 1 started going to Scranage's office approximately six months after CS#2 started going to Scranage's office. During each visit, Scranage wrote them prescriptions for Oxycodone pills.

Cooperator 1 advised that HILL paid CS#2 in cash to cover the Scranage office visits and the prescription co-payments. After receiving and filling prescriptions for Oxycodone pills, CS#2 then sold the Oxycodone pills to HILL.

In January 2015, Cooperator 1 advised that Cooperator 1 and CS#2 filled Cooperator 1's prescription for Oxycodone pills. After filling the prescription, Cooperator 1 and CS#2 traveled to HILL's residence so that CS#2 could sell Cooperator 1's Oxycodone pills to HILL.

[Agent Wyant's] review of the PMP report for CS#2 and Cooperator 1 showed that CS#2 and Cooperator 1 each received prescriptions for 180 oxycodone 30 mg pill[s] from Scranage on the following dates: August 2014, September 2014, November 2014 and January 2015 – all while HILL was on pretrial release.

On February 13, 2015, [Agent Wyant] interviewed another individual who was recruited by CS#2 (hereinafter referred to as Cooperator 2). Cooperator 2 advised that Cooperator 2 met HILL in approximately February or March 2013. From their initial meeting until approximately November 2014 (while HILL was on pretrial release), Cooperator 2 stated that he/she had obtained approximately eight prescriptions for Oxycodone pills from Scranage.

Cooperator 2 further advised that HILL had provided CS#2 with cash to pay for Cooperator 2's office visits with Scranage and to cover Cooperator 2's prescription co-payments.

After filling the prescriptions for Oxycodone pills, Cooperator 2 sold the Oxycodone pills to CS#2 for $100. Cooperator 2 advised, that based on conversations Cooperator 2 had with CS#2, the pills were then delivered to HILL in exchange for a cash payment.

[Agent Wyant's] review of the PMP report for Cooperator 2 showed that Cooperator 2 received numerous prescriptions for Oxycodone pills from Scranage between May 2013 and September 2014. Specifically, Cooperator 2 received a prescription for 180 oxycodone pills from Scranage on August 21, 2014, and a prescription for 90 oxycodone pills from Scranage on September 23, 2014, both while HILL was on pretrial release.

(*Id.* ¶¶ 13–18, 20–28 (paragraph numbers omitted).)

In addition to the above-listed evidence of Hill's continued involvement in the

distribution of Oxycodone while on pretrial release, during the April 1, 2015 meeting,

9

. . . . [Agent Wyant] asked HILL specifically about K.B., A.D., and N.B. These names had not been previously identified by HILL as pill fillers, but law enforcement had identified these individuals as working at Hill Phoenix (where HILL had worked) and also receiving prescriptions for Oxycodone from Scranage between August 2014 and March 2015 while HILL was on pretrial release.

During this interview, HILL admitted he had purchased Oxycodone pills from these three individuals, as well as one other previously identified recruit, while HILL was on [pretrial] release. HILL further admitted that he sold the Oxycodone pills to another individual, who was also a target of the investigation.

(*Id.* ¶¶ 29–30 (paragraph numbers omitted).)

Thereafter, the Government filed an unopposed motion to modify Hill's conditions of pretrial release and to revoke his bond. (*Id.* ¶ 33; ECF No. 27, at 1–3.) On April 2, 2015, the Court granted the Government's motion pending a revocation hearing. (ECF No. 28.) Later that same day, the Court held the revocation hearing and revoked Hill's bond. (ECF No. 29.) Hill was remanded to the custody of the United States Marshal until his sentencing hearing. (*See id.*)

On April 2, 2015, law enforcement applied for, and received, a search and seizure warrant for Hill's residence. (ECF No. 64–1, at 1, 5.) In support of the search and seizure warrant, Agent Wyant provided an affidavit, which set forth "facts and information regarding [Hill's] illegal conduct while on pretrial release." (ECF No. 64, at 12; *see* ECF No. 64–1, at 6–22.) In the affidavit, Agent Wyant stated, *inter alia*:

Since approximately July or August 2014, and continuing up through and including a date in January 2015, HILL has had CS#2 (on the majority of occasions) come to HILL's home located at [redacted] Eagle Pass Drive, Chesterfield, VA 23238 to sell HILL the bottles of oxycodone pills that had been filled by the pharmacy.

CS#2's last sale to HILL occurred in January 2015 at HILL's home located at [redacted] Eagle Pass Drive[,] Chesterfield VA 23238.

10

. . . .

On February 12, 2015, Cooperator 1, spoke with law enforcement and stated that Cooperator 1 and CS#2 had been seeing PHYSICIAN for alleged back pain. At each office visit, PHYSICIAN wrote them prescriptions for oxycodone pills.

. . . .

In January 2015, Cooperator 1 advised that Cooperator 1 and CS#2 filled Cooperator 1's prescription for oxycodone pills. After filling the prescription, Cooperator 1 and CS#2 then drove to HILL's residence so that CS#2 could sell Cooperator 1's bottle of oxycodone pills to HILL.

The prescription monitoring program report shows that Cooperator 1 and CS#2 each received 180 oxycodone hydrochloride pills of 30 MG from PHYSICIAN in August, September, November 2014 and January 2015.

On February 13, 2015, another individual recruited by CS#2, (hereinafter Cooperator 2), advised he/she had obtained approximately eight prescriptions for oxycodone pills from PHYSICIAN.

Cooperator 2 advised that HILL gave CS#2 cash to pay for Cooperator 2's office visits with PHYSICIAN and for Cooperator 2's prescription co-payments.

After filing the prescriptions for oxycodone pills, Cooperator 2 gave the pills to CS#2, who Cooperator 2 believes, based on conversations with CS#2, were then sold to HILL. CS#2 gave Cooperator 2 $100 for each bottle of oxycodone pills.

Cooperator 2's last visit to PHYSICIAN was in November 2014.

(ECF No. 64–1, at 18–20 (paragraph numbers omitted).)

Following the revocation of his bond, Hill moved for the substitution of counsel, and the Court granted Hill's request by Order entered on April 21, 2015. (ECF No. 32.)

Subsequently, on April 27, 2015, Agent Wyant interviewed K.B., one of the individuals who had worked at Hill's place of employment, and who had received prescriptions for Oxycodone from Dr. Scranage. (Wyant Aff. ¶¶ 31–32.) During the interview with K.B.,

. . . K.B. advised that K.B. and HILL had both worked at Hill Phoenix. HILL had referred K.B. to Scranage, and K.B. had been going to Scranage's office for approximately two years.

K.B. further stated that in August 2014, October 2014, December 2014, January 2015, February 2015, and March 2015, K.B. went to Scranage's office and received prescriptions from Scranage for Oxycodone pills. K.B. filled each of the prescriptions for Oxycodone pills, and then sold the pills to HILL at HILL's residence. As noted, this occurred during the time period when HILL was on pretrial release.

(*Id.*)

## C. Sentencing

After Hill's guilty plea and subsequent bond revocation, an amended PSR was prepared. (PSR, ECF No. 37.) Hill's Base Offense Level under Chapter Two of the USSG was 32 because the "offense involve[ed] the distribution of [the equivalent of] at least 3,000 kilograms but less than 10,000 kilograms of marijuana." (*Id.* ¶ 18; *see* USSG § 2D1.1(c)(4).) Hill received a two-level enhancement because "a dangerous weapon (including a firearm) was possessed." (PSR ¶ 19; *see* USSG § 2D1.1(b)(1).) The PSR recommended no Chapter Four enhancements and no reduction for acceptance of responsibility. (PSR ¶¶ 24–25.) Hill qualified for a criminal history score of II based on his prior convictions and the fact that he "committed portions of the instant offense while under a period of supervision for a deferred disposition on a Carry Concealed Weapon charge." (*Id.* ¶¶ 32–34.) Hill's sentencing guidelines range was 168 to 210 months of incarceration. (*Id.* at 16.)

During sentencing, neither party noted any objections, additions, or corrections to the PSR. (July 15, 2015 Tr. 3–4, ECF No. 46.)[8] With respect to the PSR's recommendation regarding no reduction for acceptance of responsibility, at Hill's

_____

[8] While the transcript states that Hill's sentencing hearing occurred on July 16, 2015, the minute entry clarifies that the hearing actually occurred on July 15, 2015. (ECF No. 42, at 1.)

sentencing hearing, the Government indicated that this took "into account the pills that [Hill] was selling while on pretrial release," which "takes away his acceptance of responsibility." (July 15, 2015 Tr. 19.) The Government argued:

> There's not much more egregious behavior that someone can engage in than being permitted by a magistrate judge to remain on supervised release, and during the entire time continue to sell Oxycodone pills. . . . And he didn't just sell a few. He sold thousands. As set forth in [the Government's] sentencing position, he sold over 3,000 Oxycodone pills while he was on supervised release.

(July 15, 2015 Tr. 19–20.)

After considering a host of relevant factors, the Court sentenced Hill to 186 months of incarceration. (July 15, 2015 Tr. 27–28; J. 2, ECF No. 43.) Hill filed no appeal. On August 8, 2016, the Court received the instant § 2255 Motion. (§ 2255 Mot. 1.)

## II.    INEFFECTIVE ASSISTANCE OF COUNSEL

To demonstrate ineffective assistance of counsel, a convicted defendant must show first, that counsel's representation was deficient and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of *Strickland*, the convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

In the context of a guilty plea, the Supreme Court modified the second prong of *Strickland* to require a showing that "there is a reasonable probability that, but for counsel's errors, [petitioner] would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Any assertion by Hill that he would not have pled guilty if he had received better assistance from counsel is not dispositive of the issue. *See United States v. Mora-Gomez*, 875 F. Supp. 1208, 1214 (E.D. Va. 1995). Rather, "[t]his is an objective inquiry and [highly] dependent on the likely outcome of a trial had the defendant not pleaded guilty." *Meyer v. Branker*, 506 F.3d 358, 369 (4th Cir. 2007) (internal citation omitted) (citing *Hill*, 474 U.S. at 59–60). The Court looks to all the facts and circumstances surrounding a petitioner's plea, including the likelihood of conviction and any potential sentencing benefit to pleading guilty. *See id.* at 369–70.

In conducting the foregoing inquiry, the representations of the defendant, his lawyer, and the prosecutor during the plea proceedings, "as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977). In light of the strong presumption of verity that attaches to a petitioner's declarations during his plea proceedings, "in the absence of extraordinary circumstances, allegations in a § 2255

motion that directly contradict the petitioner's sworn statements made during a properly conducted Rule 11 colloquy are always 'palpably incredible' and 'patently frivolous or false.'" *United States v. Lemaster*, 403 F.3d 216, 221 (4th Cir. 2005) (internal citations omitted). Thus, the United States Court of Appeals for the Fourth Circuit has admonished that "in the absence of extraordinary circumstances, the truth of sworn statements made during a Rule 11 colloquy is conclusively established, and a district court should, without holding an evidentiary hearing, dismiss any § 2255 motion that necessarily relies on allegations that contradict the sworn statements." *Id.* at 221–22. No circumstances exist here that would lead the Court to consider Hill's prior sworn statements as other than truthful.

## A.    Claim One

In Claim One, Hill contends that "[f]irst trial counsel" rendered ineffective assistance because counsel failed to file a suppression motion seeking to suppress "statements and evidence seized from the unconstitutional questioning of [Hill] on June 25, 2014." (§ 2255 Mot. 4.) Hill asserts that "[c]ounsel was made aware of [the] deficiencies of this questioning but never advised [Hill] of the option to seek suppression." (*Id.*) Hill also asserts that "[h]ad counsel followed through with this meritorious motion to suppress, there is a reasonable probability [Hill] would not have pled guilty and instead proceeded to trial." (Reply 3, ECF No. 58.)

In support of Claim One, Hill submits his own affidavit, which he "[s]igned under the pains and penalty of perjury." (Hill Aff. 3, ECF No. 48–1). In his affidavit, Hill states: "On June 25, 2014, I completed a transaction during which I collected payment

for pills I had 'fronted' to an individual for approximately $3,180. That individual turned out to be a government informant acting on their direction." (Hill Aff. ¶ 2.) Further, Hill states:

> This individual and I met in their vehicle in a parking lot. Immediately upon completing the sale, as I exited the vehicle, numerous law enforcement agents rushed towards me with their weapons drawn, shouting at me to "get down on the ground."
> While lying in a prone position, my hands were handcuffed behind my back. Only after I was handcuffed did officers conduct a pat-search and discover the cash in my pocket.
> I was then picked up off the ground, placed in a van and driven to another location approximately 5 blocks away. Inside this van I was still handcuffed and surrounded by several armed law enforcement officers.
> When the van came to a stop, the officers began questioning me. At no time did they advise me of my *Miranda*[9] rights. At no time was I told I could leave. All of the questioning was conducted while I was handcuffed inside this van several blocks from my car. I did not know where I was and assumed I was being arrested.

(*Id.* ¶¶ 3–6 (omitting internal paragraph numbers).)

As an initial matter, Hill's instant allegations regarding his interaction with law enforcement officers on June 25, 2014 and counsel's performance with regard to filing a motion to suppress are belied by the record. Specifically, Hill's present allegations are contrary to Hill's sworn statements during the Rule 11 plea colloquy and the Statement of Facts accompanying Hill's Plea Agreement. Hill's Plea Agreement and the plea colloquy also undercut Hill's contention regarding the voluntariness of his guilty plea. (*See* Jan. 5, 2015 Tr. 5, 9, 12, 23; *see also* Plea Agreement ¶ 2.)[10] In light of Hill's sworn statements

---

[9] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[10] For example, in the Plea Agreement, Hill agreed that he was pleading guilty because he was in fact guilty of the charged offense, "admit[ted] the facts set forth in the statement of facts filed

during the Rule 11 proceedings, absent extraordinary circumstances, Hill's instant statements to the contrary are "palpably incredible." *Lemaster*, 403 F.3d at 222 (citation omitted); *see Escamilla v. Jungwirth*, 426 F.3d 868, 870 (7th Cir. 2005) (citations omitted) ("It is difficult to see how a collateral attack based on the proposition that the petitioner's own trial testimony was a pack of lies has any prospect of success. Litigants must live with the stories that they tell under oath."), *abrogated on other grounds by McQuiggin v. Perkins*, 569 U.S. 383, 397 (2013). Hill fails to demonstrate any such extraordinary circumstances. *See Lemaster*, 403 F.3d at 221–22 (citations omitted) (explaining that "extraordinary circumstances" may exist if a "petitioner introduce[s] documentary evidence supporting his claim that he was severely ill, both physically and mentally, and uncounselled at the time of his Rule 11 colloquy"). Because Hill fails to demonstrate any extraordinary circumstances, "the truth of [his] sworn statements made during [the] Rule 11 colloquy is conclusively established." *Id.* at 222. For this reason alone, Claim One can be dismissed.

---

with this plea agreement[,] and agree[d] that those facts establish guilt of the offense charged beyond a reasonable doubt." (Plea Agreement ¶ 2.) Further, in the accompanying Statement of Facts, Hill agreed that "[l]aw enforcement approached HILL immediately after the meeting. He was not under arrest, and was advised that he was free to leave at any time. During a pat-down of HILL, law enforcement recovered the $3,180.00 in United States currency . . . ." (Statement of Facts ¶ 8.) Hill also agreed that he then "advised that he had been buying and redistributing Oxycodone pills and Oxycodone prescriptions during the two-year time period preceding June 2014." (*Id.* ¶ 9.)

Additionally, Hill agreed that he was "entirely satisfied with [counsel's] services" and that counsel had "done everything reasonable [Hill had] asked [counsel] to do in connection with [Hill's] case." (Jan. 5, 2015 Tr. 5.) When asked if anyone had "threatened [him] or forced [him] in any way to enter into [the] plea agreement," Hill responded: "No, sir." (Jan. 5, 2015 Tr. 11–12.) Further, Hill agreed that he was pleading guilty "freely and voluntarily" (Jan. 5, 2015 Tr. 12), and that no one had "instructed [him] how to answer any of [the Court's] questions." (Jan. 5, 2015 Tr. 23.)

Hill also fails to demonstrate any prejudice under *Strickland*. To establish prejudice, Hill must show that "but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. "To determine [Hill's] reasonable likelihood of going to trial, [the Court] must look to the strength of the [Government's] case 'inasmuch as a reasonable defendant would surely take it into account.'" *United States v. Swaby*, 855 F.3d 233, 243 (4th Cir. 2017) (citation omitted). Hill must show that a decision to proceed to trial "would have been rational under the circumstances." *United States v. Fugit*, 703 F.3d 248, 260 (4th Cir. 2012) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)). "[Hill's] subjective preferences, therefore, are not dispositive; what matters is whether proceeding to trial would have been objectively reasonable in light of all of the facts." *Id.* (citation omitted).

Here, if Hill's counsel had filed a successful suppression motion, resulting in the suppression of Hill's statements to law enforcement officers and the recovery of $3,180.00 from Hill on June 25, 2014, there is still overwhelming evidence of Hill's guilt. Therefore, it is not reasonably likely that a defendant, such as Hill, would have rationally proceeded to trial.

Specifically, even if Hill's statements and the recovered money were suppressed, based on the controlled purchases between Hill and the confidential informant, probable cause would have existed to support the issuance of the search warrant for Hill's residence. *See United States v. Patterson*, 406 F. App'x 773, 782–83 (4th Cir. 2011) (citation omitted) ("The controlled purchase not only corroborated the [confidential informant's] statements regarding her past purchases, but also provided independent

grounds on which to base the finding of probable cause."); *United States v. Redd*, 341 F. App'x 864, 866–67 (4th Cir. 2009) (affirming the denial of a motion to suppress, in which the defendant had argued that a confidential informant's statements were insufficient to support the issuance of a search warrant, when the confidential informant had worked with the police "on controlled drug purchases for the prior four or five months" and the confidential informant's "veracity, reliability, and basis of knowledge [were] well-established"). When executing the search warrant at Hill's residence, law enforcement officers recovered three firearms, Oxycodone pills, empty Oxycodone pill bottles, and approximately $20,000.00 in United States currency under Hill's mattress. (Statement of Facts ¶¶ 13–14.) The recovery of these items from Hill's residence provides overwhelming evidence of Hill's guilt.

Therefore, even if Hill's statements to law enforcement officers and the recovery of $3,180.00 from Hill on June 25, 2014 had been suppressed, overwhelming evidence of his guilt existed based on the evidence from the prior controlled purchases between Hill and the confidential informant and the ensuing investigation, which included the execution of a search warrant at Hill's residence and the recovery of drugs, firearms, and money. Based on this overwhelming evidence of guilt, a rational defendant would not have risked proceeding to trial. *See Fugit*, 703 F.3d at 260–61 ("[P]roceeding to trial would have been irrational where defendant 'faced overwhelming evidence of her guilt' and 'had no rational defense, would have been convicted and would have faced a longer term of incarceration.'" (quoting *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012))).

Thus, Hill has failed to demonstrate any deficiency of counsel or resulting prejudice with respect to counsel's failure to file a motion to suppress and Hill's decision to plead guilty. *See Strickland*, 466 U.S. at 687, 691; *see also Hill*, 474 U.S. at 59. Accordingly, Claim One will be dismissed.

**B.    Claim Two (a) and (b)**

In Claim Two (a), Hill contends that "[f]irst trial counsel failed to appropriately explain conspiracy liability which led to [Hill's] erroneous 'admission' of conduct that was the basis" for the "recommendation against the reduction for acceptance of responsibility" in the PSR. (§ 2255 Mot. 5.) In Claim Two (b), Hill contends that sentencing counsel rendered ineffective assistance because sentencing counsel failed to object to the "recommendation against the reduction for acceptance of responsibility" in the PSR. (*Id.*) In support of Claim Two (a) and (b), in Hill's affidavit, he states:

> During the time I was on house arrest, several people who were still engaged in selling drugs contacted me on my cell phone. All of these calls were merely to wish me well and inquire about my well-being. At no time did we discuss their ongoing drug sales. At no time did I participate in any kind of illicit activity during these calls.
> . . . .
> On April 1, 2015, just days before my first scheduled sentencing date, my attorney, David Whaley, contacted me. He sounded panicked and told me to come to a specific address "right away." When I arrived, it turned out to be a meeting where I found myself in a conference room with law enforcement agents.
> Those agents began questioning me about whether I had continued selling Oxycodone while on [pretrial] release. I had not and said so.
> At that point, Attorney Whaley attempted to explain conspiracy liability to me. He told me that if anyone I knew was still selling drugs, I could be held responsible for those sales as well and that "basically, if you know they're still dealing it's the same as if you were doing it yourself."
> Even though I had not sold any additional drugs since my arrest, I did know several people still selling drugs on a regular basis. Based on my

lawyer's explanation of conspiracy liability, I assumed that meant that I too was still "selling drugs." With that understanding, I then told the agents in that meeting that yes, I was selling drugs while on [pretrial] release.

(Hill Aff. ¶¶ 7, 9–12 (omitting internal paragraph numbers).) The Court addresses Claim

Two (a) and Claim Two (b), in turn.

### 1. Claim Two (a)

As noted above, in Claim Two (a), Hill contends that based on the advice of his

"[f]irst trial counsel," Hill "erroneous[ly]" admitted to continuing to buy and sell drugs

while on pretrial release and this "erroneous 'admission'" resulted in the Government's

"recommendation against the reduction for acceptance of responsibility" in the PSR.

(§ 2255 Mot. 5.) Hill argues:

> Taking forensic data from his phone out of context, the Government simply assumed the phone calls [Hill] received from former conspiracy members or other known drug dealers meant he had continued to sell pills and prescriptions while on home detention. The Government offered no evidence other than [his] 'admission' from that surprise meeting based upon his counsel's erroneous advice.

(Mem. Supp. § 2255 Mot. 9–10, ECF No. 48.) Hill further argues that if counsel "had

spoken to [him] and conducted even the most cursory of investigations, [counsel] would

have discovered there was no substance to these allegations." (*Id.* at 9.)

With respect to counsel's explanation regarding Hill's culpability for the

conspiracy charge set forth in the one-count Criminal Information, during the Rule 11

proceedings, Hill confirmed his understanding of the charge against him and the penalties

for the charge. (*See, e.g.*, Jan. 5, 2015 Tr. 2–3, 6–8, 16–19.) Hill also agreed that prior to

his guilty plea he "had an ample opportunity to discuss [his] case in detail with [his]

attorney." (Jan. 5, 2015 Tr. 5.) Hill's statements about his lack of understanding of his culpability in a conspiracy are "palpably incredible" in light of his sworn statements during the Rule 11 proceedings. *Lemaster*, 403 F.3d at 222 (citation omitted).

> Furthermore, Hill also fails to demonstrate any prejudice under *Strickland*.

> To prove conspiracy to possess with intent to distribute and to distribute a controlled substance, the government must establish that: (1) two or more persons agreed to possess with intent to distribute and to distribute the substance; "(2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy."

*United States v. Thomas*, 327 F. App'x 442, 443 (4th Cir. 2009) (quoting *United States v. Yearwood*, 518 F.3d 220, 225–26 (4th Cir. 2008)). "Withdrawal from a conspiracy 'requires the defendant to take affirmative actions inconsistent with the object of the conspiracy and [to] communicate his intent to withdraw in a manner likely to reach his accomplices.'" *United States v. Lispscomb*, 494 F. App'x 314, 316 (4th Cir. 2012) (quoting *United States v. Cardwell*, 433 F.3d 378, 391 (4th Cir. 2005)).

> Once it has been established that a defendant has participated in a conspiracy, the defendant's membership in a conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action. Withdrawal must be shown by evidence that the defendant acted to defeat or disavow the purposes of the conspiracy.

*Id.* (citing *United States v. West*, 877 F.2d 281, 289 (4th Cir. 1989)).

As an initial matter, Hill's characterization of his counsel's explanation of conspiracy liability is consistent with the above-discussed standards for participation in and withdrawal from a criminal conspiracy, and Hill's assertions to the contrary lack merit. *See Thomas*, 327 F. App'x at 443 (citation omitted); *see also Lispscomb*, 494 F. App'x at 316 (citation omitted).

Furthermore, even if Hill had not admitted to continued involvement in the distribution of Oxycodone while on pretrial release, there is still overwhelming evidence of Hill's engagement of such activity while on pretrial release. Specifically, as detailed above, using the PMP, which is a database for all "Schedule II, III, and IV controlled substances filled at pharmacies in the Commonwealth of Virginia," law enforcement determined that "multiple individuals who had been recruited by HILL to fill Oxycodone prescriptions were still obtaining and continuing to fill Oxycodone prescriptions written by Scranage even after HILL had been released on pretrial supervision on July 30, 2014." (Wyant Aff. ¶¶ 11–12.) Further, during law enforcement's investigation, several confidential sources and other individuals cooperating with law enforcement confirmed that they had sold Oxycodone pills to Hill during the period of approximately August 2014 and continuing through January 2015, while Hill was on pretrial release. (*See, e.g.,* *id.* ¶¶ 17–23, 25–27, 31–32; *see also* ECF No. 64–1, at 18–20.)

Based on this information, there is overwhelming evidence of Hill's continued direct involvement in the distribution of Oxycodone while on supervised release. Therefore, even if Hill had not "erroneous[ly]" admitted to continuing to buy and sell drugs on pretrial release, which Hill contends he did based on counsel's incorrect advice regarding conspiracy liability, there is overwhelming evidence of Hill's continued direct participation in the buying and selling of drugs while on pretrial release. (*See* § 2255 Mot. 5.) This other evidence of Hill's continued illegal activity while on pretrial release, on its own, is sufficient to support the Government's "recommendation against the reduction for acceptance of responsibility" in the PSR. (*See id.*); *see also United States*

*Sentencing Guidelines Manual* § 3E.1.1 cmt. n.3 (U.S. Sentencing Comm'n 2014).

Therefore, Hill has failed to demonstrate any deficiency of counsel or resulting prejudice

with respect to "[f]irst trial counsel['s]" advice regarding conspiracy liability. (*See*

§ 2255 Mot. 5); *see also Strickland*, 466 U.S. at 687, 691. Accordingly, Claim Two (a)

will be dismissed.

### 2. Claim Two (b)

In Claim Two (b), Hill faults his sentencing counsel for failing to "object to the

recommendation against the reduction for acceptance of responsibility" in the PSR.

(§ 2255 Mot. 5.)

With respect to sentencing adjustments for acceptance of responsibility, section

3E1.1 of the USSG provides:

> (a) If the defendant clearly demonstrates acceptance of responsibility for
> his offense, decrease the offense level by 2 levels.
>
> (b)  If the defendant qualifies for a decrease under subsection (a), the
> offense level determined prior to the operation of subsection (a) is
> level 16 or greater, and upon motion of the government stating that
> the defendant has assisted authorities in the investigation or
> prosecution of his own misconduct by timely notifying authorities of
> his intention to enter a plea of guilty, thereby permitting the
> government to avoid preparing for trial and permitting the
> government and the court to allocate their resources efficiently,
> decrease the offense level by 1 additional level.

*United States Sentencing Guidelines Manual* § 3E.1.1. As to subsection (a),

> [e]ntry of a plea of guilty prior to the commencement of trial combined
> with truthfully admitting the conduct comprising the offense of conviction,
> and truthfully admitting or not falsely denying any additional relevant
> conduct for which he is accountable under § 1B1.3 (Relevant Conduct) (*see*
> Application Note 1(A)), will constitute significant evidence of acceptance
> of responsibility for the purposes of subsection (a). However, this evidence

may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to adjustment under this section as a matter of right.

*Id.* cmt. n.3 (emphasis omitted). "[T]o be eligible for this downward departure, 'the defendant must prove by a preponderance of the evidence that he has clearly recognized and affirmatively accepted personal responsibility for his criminal conduct.'" *United States v. McKenzie-Gude*, 671 F.3d 452, 463 (4th Cir. 2011) (quoting *United States v. Nale*, 101 F.3d 1000, 1005 (4th Cir. 1996)). Further, the Fourth Circuit "has held that a defendant's continued use or sale of drugs after conviction may be a basis for denial of acceptance of responsibility." *United States v. Jarrell*, 296 F. App'x 342, 343 (4th Cir. 2008) (citing *United States v. Kidd*, 12 F.3d 30, 34 (4th Cir. 1993); *United States v. Underwood*, 970 F.2d 1336, 1339 (4th Cir. 1992)).

Here, before Hill's sentencing hearing, at a scheduled meeting with "the United States Attorney's office and agents with the Federal Bureau of Investigation," Hill "was provided with evidence, including documents and other investigatory materials showing his continued involvement in the distribution of Oxycodone" between July 2014 and March 2015, which was while Hill was on pretrial release." (ECF No. 27, at 1; ECF No. 64–1, at 20.) During this meeting, Hill admitted to continuing to buy and sell drugs while on pretrial release. (*See, e.g.*, Wyant Aff. ¶¶ 29–30.)

Hill now contends that he misunderstood conspiracy liability and mistakenly admitted to continuing to buy and sell drugs while on pretrial release based on first trial counsel's advice. However, as explained above, even if Hill had not admitted to continued participation in the distribution of drugs while on pretrial release, there is still

overwhelming evidence of his continued participation in such criminal activity. Hill's continued engagement in criminal conduct may serve as a basis for the denial of a sentencing reduction for acceptance of responsibility. *See McKenzie-Gude*, 671 F.3d at 463 (citation omitted); *Jarrell*, 296 F. App'x at 343 (citations omitted); *see also United States Sentencing Guidelines Manual* § 3E.1.1 cmt. n.3. Therefore, Hill's claim regarding entitlement to a sentencing reduction for acceptance of responsibility lacks merit.

Because Hill's claim regarding entitlement to a sentencing reduction for acceptance of responsibility lacks merit, sentencing counsel reasonably eschewed the challenge Hill urges here and cannot be faulted for failing to raise a meritless objection. *See Moore v. United States*, 934 F. Supp. 724, 731 (E.D. Va. 1996) (explaining that "[f]ailure to raise a meritless argument can never amount to ineffective assistance"). Furthermore, Hill fails to demonstrate that counsel's inaction regarding this meritless argument resulted in any deficiency of counsel or resulting prejudice. *See Strickland*, 466 U.S. at 687, 691; *see also Hill*, 474 U.S. at 59. Accordingly, Claim Two (b) lacks merit and will be dismissed.

### III.  CONCLUSION

For the foregoing reasons, Hill's § 2255 Motion (ECF No. 47) will be denied.  The action will be dismissed.  A certificate of appealability will be denied.

An appropriate Order shall issue.

_____/s/_____
HENRY E. HUDSON
SENIOR UNITED STATES DISTRICT JUDGE

Date: Aug 26, 2019
Richmond, Virginia